UNITED STATES DISTRICT COURT
OF THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KRISTIE MARIE SCHLIFKE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:05-cv-00620-SLR |
| | ) | |
| COCONUTS MUSIC AND MOVIES | ) | |
| AND TRANS WORLD | ) | |
| ENTERTAINMENT CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>OPENING BRIEF IN SUPPORT OF DEFENDANT TRANS WORLD
ENTERTAINMENT CORPORATION'S MOTION FOR SUMMARY
JUDGMENT</u>**

Jennifer Gimler Brady (Bar I.D. #2874)
Sarah E. DiLuzio (Bar I.D. #4085)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19801
(302) 984-6000 - Telephone
(302) 658-1192 – Facsimile
jbrady@potteranderson.com – Email
sdiluzio@potteranderson.com - Email

OF COUNSEL:

Tyler A. Brown, Esquire
Jackson Lewis LLP
8614 Westwood Center Drive, Suite 950
Vienna, Virginia 22182
Telephone: (703) 821-2189
Facsimile: (703) 821-2267

*Attorneys for Trans World Entertainment
Corporation*

Dated: May 26, 2006

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

SUMMARY OF ARGUMENT ............................................................................. 2

STATEMENT OF FACTS .................................................................................. 3

    Plaintiff's Employment With Trans World ........................................................ 3

    Plaintiff Experienced Inventory Control Problems Throughout
        Her Employment ........................................................................... 4

    Trans World Did Not Try to Limit the Number of Assistant Managers
        In Plaintiff's Store ........................................................................ 8

    Plaintiff's Security Concerns Are Misguided ....................................................... 9

    Plaintiff's Allegations About Burke Calling Her Into Work While
        On Bed Rest Prove Nothing ............................................................... 9

    The Delaware Department of Labor Found In Favor of Trans
        World ...................................................................................... 9

    Trans World Consistently Enforces Its Target Store Policies ............................... 10

ARGUMENT ................................................................................................ 10

I.    SUMMARY JUDGMENT IS APPROPRIATE ON ALL OF
      PLAINTIFF'S CLAIMS BECAUSE PLAINTIFF CANNOT
      MAKE OUT THE ESSENTIAL ELEMENTS OF HER CLAIMS
      AND THERE ARE NO GENUINE ISSUES OF MATERIAL
      FACT ...................................................................................... 10

II.   TRANS WORLD IS ENTITLED TO SUMMARY JUDGMENT
      ON PLAINTIFF'S TITLE VII, PREGNANCY
      DISCRIMINATION ACT AND STATE LAW
      DISCRIMINATION CLAIMS .......................................................... 11

    A.    Plaintiff Must Meet A Rigorous Standard to Prove
          Discrimination ...................................................................... 11

B.    Plaintiff's Sex and Pregnancy Discrimination Claims Fail
As A Matter of Law ............................................................................... 14

     1.     Plaintiff Cannot Meet Her *Prima Facie* Burden ............................ 14

          a.     Plaintiff's Staffing Claim is Without Merit ....................... 14

          b.     Plaintiff's Security Argument Fails ................................... 16

          c.     The Disciplinary Warnings Given to Plaintiff
Are Non-Discriminatory ................................................... 17

          d.     Being Required to Work While on Bed Rest
On One Occasion Is Not an Adverse Employment
Action ................................................................................ 18

          e.     Plaintiff Cannot Demonstrate a *Prima Facie* Case
with Regard to Her Discharge ........................................... 18

     2.     Trans World Acted With Legitimate and Non-
Discriminatory Reasons ................................................................. 19

     3.     Plaintiff Cannot Establish that Trans World's Reasons
Are Pretextual ............................................................................... 19

III.    TRANS WORLD IS ENTITLED TO SUMMARY JUDGMENT
ON PLAINTIFF'S STATE LAW CLAIM FOR INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS .................................................. 21

   A.    Plaintiff's Intentional Infliction Claim is Preempted by
Workers' Compensation Exclusivity ............................................... 21

   B.    Plaintiff Cannot State a *Prima Facie* Case of Intentional
Infliction of Emotional Distress ....................................................... 22

IV.    TRANS WORLD IS ENTITLED TO SUMMARY JUDGMENT
ON PLAINTIFF'S FMLA RETALIATION CLAIM .................................... 23

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*Abramson v. William Paterson College of New Jersey*, 260 F.3d 286
    (3d Cir. 2001) ........................................................................................... 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................ 10

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) ............................. 15

*Cannon v. State of Delaware*, 523 F. Supp. 341 (D. Del. 1981) ................ 12

*EEOC v. Metal Service, Co.*, 892 F.2d 341 (3d Cir. 1990) ........................ 12

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271 (3d Cir. 2000) ......... 23, 24

*Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994) ................................... 13, 20

*Giles v. Family Court*, 411 A.2d 599 (Del. 1980) ..................................... 11

*Jones v. Sch. Dist. of Phila.*, 198 F.3d 403 (3d Cir. 1999) ....................... 12

*Keller v. Orix Credit Alliance*, 130 F.3d 1101 (3d Cir. 1997) .................. 13

*Kidd v. MBNA America Bank, N.A.*, 224 F.Supp.2d 807 (D. Del. 2002) ......... 10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574
    (1986) ......................................................................................................... 10

*Konstantopoulos v. Westvaco Corp.*, 690 A. 2d 936 (Del. 1996) .............. 22

*Mattern v. Hudson*, 532 A.2d 85 (Del. Super. Ct. 1987) ........................... 22

*Mandelaka v. Boyd*, 1993 WL 258798 (Del. Super. Ct.) ........................... 22

*McDonnell Douglas Corp v. Green.* 411 U.S. 792 (1973) ..................... 11,12

*McKay v. Delaware State University*, 2000 WL 1481018 (D. Del.) ............ 11

*Miller v. Town of Milton*, 2005 WL 549531 (D. Del.) ................................ 12

*Rhett v. Carnegie Center Associates*, 129 F.3d 290 (3d Cir. 1997) ........... 12

*Revis v. Slocumb Indus.*, 814 F. Supp. 1209 (D. Del. 1993) ..................... 11

*Nelson v. Upsala College*, 51 F.3d 383 (3d Cir. 1995) ............................. 15

*Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d Cir. 1997) ................................. 15

*Seabrook v. Gadow*, 2003 WL 2138719 (D. Del.) .............................................. 13, 21

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ......................................... 14, 20

## STATUTES

42 U.S.C. § 2000 ................................................................................................ *passim*

19 Del. C. § 2304 ................................................................................................ 22

## RULES

Fed. R. Civ. P. 56 .............................................................................................. 10

## NATURE AND STAGE OF THE PROCEEDINGS

This is an employment discrimination case brought by Plaintiff Kristie Marie Schlifke ("Schlifke" or "Plaintiff") against her former employer, Trans World Entertainment Corporation (doing business as and erroneously sued herein as "Coconuts Music and Movies") ("Trans World" or "the Company"). Plaintiff was hired by Trans World on March 11, 2002 as the Manager for Coconuts Store #1584 in Wilmington, Delaware. Trans World appropriately disciplined and ultimately terminated Plaintiff on May 5, 2003 for repeated policy violations.

Plaintiff filed her Complaint against Trans World on August 23, 2005, claiming that she was discriminated against in violation of Title VII, the Pregnancy Discrimination Act and the Delaware Discrimination in Employment Act based on her sex and pregnancy; that she had suffered intentional infliction of emotional distress; and had been retaliated against for exercising her rights under the Family and Medical Leave Act. (Docket Entry (D.E.) 1). Trans World was served with Plaintiff's Complaint and filed its Answer on September 13, 2005, denying all of Plaintiff's claims and asserting a number of defenses to them. (D.E. 2).

On November 17, 2005, the Court held a scheduling conference and ordered that discovery be completed by April 28, 2006. During the discovery period, documents were exchanged and Plaintiff's deposition was taken. Plaintiff did not take any depositions. She propounded one set of requests for production of documents. Trans World now moves the Court to enter summary judgment in its favor on all of Plaintiff's claims and submits this Opening Brief in support of its motion.

1

## SUMMARY OF ARGUMENT

      I.     Summary judgment is appropriate in this case because Plaintiff has failed to establish a genuine issue of material fact and cannot support all the elements of her claims.  Therefore, Trans World is entitled to judgment as a matter of law.

      II.     Trans World is entitled to summary judgment on Plaintiff's disparate treatment claims under Title VII, the Pregnancy Discrimination Act and the Delaware Discrimination in Employment Act because: (1) Plaintiff cannot establish her *prima facie* case; (2) Trans World acted with legitimate, non-discriminatory reasons; and (3) there is no evidence of pretext.

      III.     Trans World is entitled to summary judgment on Plaintiff's claim for intentional infliction of emotional distress claim because Plaintiff cannot make out her *prima facie* case.

      IV.     Trans World is entitled to summary judgment on Plaintiff's retaliation claim under the Family and Medical Leave Act.  The retaliation claim fails because there is no causal link between the purported adverse employment action and the purported protected activity.

## STATEMENT OF FACTS

### Plaintiff's Employment with Trans World

1.      Plaintiff was hired by Trans World Entertainment on March 11, 2002 as the Manager for Coconuts Store #1584 in Wilmington, Delaware. *See* Affidavit of Deb Markowitz-Best ("DMB Aff."), ¶ 2.  (A86)[1].

2.      Plaintiff's Position Description states that, among her duties, she was responsible for protecting "all corporate assets by following Loss Prevention guidelines." *See* Plaintiff's Position Description (A1); Plaintiff's Deposition, taken March 7, 2006 ("Pl. Dep."), pp. 84:19-85:11 (A59-60).

3.      Plaintiff underwent at least six days of training, during which she was instructed on, among other things, Loss Prevention policies and procedures. *See* Training Checklist (A3-12); Pl. Dep., pp. 85:12-89:6 (A59-64).

4.      Trans World is an equal employment opportunity employer with a strong published policy prohibiting all harassment. The policy clearly states that "TWEC does not discriminate in any term or condition of employment on the basis of . . . sex . . . . Trans World Entertainment is dedicated to ensuring the fulfillment of this policy with respect to hiring, placement, promotion, transfer, demotion, lay-off, termination, recruitment, advertising, rates of pay or other forms of compensation, selection for training and general treatment during employment." *See* Trans World's Equal Employment Opportunity Policy (A14); Pl. Dep., pp. 89:20-90:19 (A64-65).

5.      Plaintiff understood that the Target Store Program set guidelines by which a store would be put under greater scrutiny if it did not meet certain goals

---

[1]      Pertinent documentary evidence and excerpts of the Plaintiff's deposition transcripts are included in Defendant's Appendix to its Opening Brief in Support of its Motion for Summary Judgment, referred to herein as ("A__"), and filed contemporaneously herewith.

regarding shrink percentage (as opposed to absolute dollar amount of loss). *See* Pl. Dep., pp. 72:9-19; 73:18-22, 105:2-5 (A54-55, 69); Target Store Program policy (A16-19).

      6.     "Shrink" is the amount of inventory that is lost, either in the form of cash or products. Shrink has an impact on the bottom line profit for the store. *See* Pl. Dep., p. 73:10-17 (A55).

      7.     Plaintiff understood that it was part of her job to make sure that shrink percentages were within acceptable limits and accepted responsibility for the store's poor performance. She understood that if the store did not meet Company standards, she was subject to disciplinary action, up to and including discharge. *See* Pl. Dep., pp. 34:7-12; 74:1-8 (A45, 56).

<strong>Plaintiff Experienced Inventory Control Problems<br>Throughout her Employment with Trans World</strong>

      8.     During the month of April 2002, shortly after Schlifke joined the Company, per the Company's "Store Manager Change Inventory Policy," an inventory was performed in Store #1584. *See* Store Manager Change Inventory Policy (A15); Pl. Dep., pp. 100:14-102:16 (A66-68); DMB Aff., ¶ 3 (A86).

      9.     The shrink result was -6%, well over the 2002 shrink goal for Store #1584 of -1.6%. *See* DMB Aff., ¶ 4 (A86).

      10.    According to the Company's "Target Store Policy," a first-time shrink result .5% over the stated goal results in a written warning for the store's manager. Had Plaintiff been the store manager for the entire timeframe for which the inventory results were generated, she would have received this written warning. However, since she had not been the manager for the entire timeframe covered by the April 2002 inventory, by Company practice she was not held responsible, did not receive a written

4

warning, and this inventory shrink result did not impact the assessment of Plaintiff's performance as of April 2002. *See* Target Store Policy (A16-19); DMB Aff., ¶ 5 (A86).

11.    On August 13, 2002, Plaintiff received a written warning for a Customer Service Shop score of 40%. A Customer Service Shop score is the result of a secret shop conducted by an independent vendor measuring, among other factors, levels of customer service and adherence to the Company's sales program on the part of the store manager. The Company's minimum acceptable score is 70%, and the goal for Plaintiff's region at that time was a consistent average score of 85% or better. Poor customer service is considered a misconduct violation under the Company Associate Handbook. *See* Written Warning dated August 13, 2002 (A21); Excerpt from Company Associate Handbook (A22); DMB Aff., ¶ 6 (A86-87).

12.    After receiving the written warning concerning the Customer Service Shop, Plaintiff understood that continued poor results could lead to discipline or discharge. *See* Pl. Dep., p. 112:18-21 (A70).

13.    On November 5, 2002, Plaintiff received a final written warning for a store inventory taken in August 2002 showing a shrink result of -8.3%. *See* Counseling Process Form (A23). This shrink alone represented a financial loss to the Company of $22,135.27. The 2002 shrink result goal for Plaintiff's store was -1.6%, more than 5 times less than the actual shrink results of Plaintiff's store. Plaintiff received this disciplinary warning because (a) she already had a written warning in her file from August 13, 2002, for an unsatisfactory Customer Service Shop score of 40%; and (b) Plaintiff has been the store manager for the entire period prior to the August 2002

5

inventory, so the unfavorable shrink result was entirely her responsibility. *See* Pl. Dep., pp. 115:6-116:22; 118:8-1 (A74-75, 77).; DMB Aff., ¶ 7 (A87).

14.     Plaintiff understood that there was a possibility she would be discharged if her next inventory was unsatisfactory.   *See* Pl. Dep., pp. 115:6-116:22; 118:8-12 (A74-75,77).

15.     A shrink result of -8.3% was particularly high and egregious, and indicated very poor performance on the part of Schlifke as Store Manager.  *See* DMB Aff., ¶ 8 (A87).

16.     Plaintiff did not receive this final written warning until November 2002 merely because initial inventory results take a number of weeks to finalize. However, with the advent of new computer technology installed by the Company during the last several years, the initial inventory results are almost always the same metrics as the final inventory results.   *See* DMB Aff., ¶ 9 (A87); Pl. Dep., p. 102:1-16 (A68).

17.     Also, on November 5, 2002, Plaintiff received a performance review with an overall below-standards rating, which required that she be placed on a performance improvement plan.   Plaintiff acknowledged and accepted both the performance improvement plan and the final written warning with her signature.  *See* Performance Appraisal and Performance Improvement Plan signed by Plaintiff on November 5, 2002 (A24-31, 32-35); DMB Aff., ¶ 10 (A87).  Plaintiff knew she could be discharged if she did not improve her performance in the areas identified in the review. *See* Pl. Dep., pp. 119:13-122:1 (A77-80).

18.    On November 10, 2002, Plaintiff received another unsatisfactory Customer Service Shop score of 55%. *See* Counseling Process Form (A36); Pl. Dep., pp. 138:1-139:2 (A83-84).

19.    In February 2003, Trans World conducted another regularly scheduled inventory in Plaintiff's store. By the end of February 2003, both Plaintiff and the Company received the initial shrink result of the inventory for the store. The inventory results once again were dramatically above acceptable Company norms:  -10.7%, with a total loss to the Company of $60,482. Again, Plaintiff had been the manager of the store for the entire period prior to the February 2003 inventory, making her solely responsible for the loss to the Company. It was also significant that this result was 2.4% points higher than the previous inventory taken for Schlifke's store. *See* DMB Aff., ¶ 11 (A88); Pl. Dep., p. 134:2-14 (A81).

20.    Plaintiff was not terminated at this point in time, because as previously stated, it has been the long-standing practice of the Company to wait until final inventory results are finalized – a throw-back to when inventories were manually taken with paper and pencil and not with the state-of-the-art computer technology utilized by the Company today to calculate store inventories. *See* DMB Aff., ¶ 12 (A88).

21.    Consistent with the final written warning she received on November 5, 2002, Schlifke was warned at this time by her immediate manager, District Manager Rob Burke ("Burke"), that the chances were good that once the inventory results were finalized, she would be terminated. *See* DMB Aff., ¶ 13 (A88).

22.    On April 11, 2003, Regional Manager Alan Lauritsen (District Manager Rob Burke's immediate manager) visited Plaintiff's store, and found that it was

not being run to Company standards of inventory control and customer service. Lauritsen reiterated to Plaintiff that she was in jeopardy of losing her job due to her substandard job performance and the initial shrink results that were in the process of being finalized. *See* DMB Aff., ¶ 14 (A88-89); Pl. Dep., p. 137:2-13 (A82).

23.    In late April or early May 2003, the shrink results for the inventory taken in Plaintiff's store were finalized and it was indeed -10.7% -- an egregiously high shrink result as her goal was -1.9%. Her results represented a significant loss to the Company. Consequently, on May 5, 2003, Plaintiff was appropriately terminated for consistent substandard performance (including the poor November 2002 Customer Service Shop score) and poor shrink results. See DMB Aff., ¶15 (A89); Counseling Process form (A36).

24.    Lauritsen, Burke's supervisor, recommended that Plaintiff be fired. Deb Markowitz-Best, the Director, Associate Relations and Staffing, made the decision to terminate Plaintiff's employment. *See* DMB Aff., ¶ 15 (A89).

25.    Plaintiff claims that other store managers had poor shrink figures, but were not disciplined. Yet, Plaintiff admits she is not sure of the exact shrink figures and does not know if she was treated differently with regard to discipline imposed for not meeting Company standards. *See* Pl. Dep., pp. 75:1-76:20 (A57-58).

26.    Plaintiff was replaced as store manager by a female, Stephanie Heath. *See* DMB Aff., ¶ 16 (A89).

### Trans World Did Not Try to Limit the Number of Assistant Managers in Plaintiff's Store

27.    Trans World hired at least two assistant managers during the January to May time frame that Plaintiff cites as the period in which she was left

shorthanded.  *See* Pl. Dep., pp. 53:10-55:9 (A47-49).  She was also told that interviews were conducted during that time and has no reason to doubt this is true. *Id.*

28.    Other stores refused to send substitute managers to her store to help her.  *See* Pl. Dep., pp. 61:17-62:3; 64:3-13 (A50-51, 53).  Other stores did not like to share their assistant managers. *Id*

### Plaintiff's Security Concerns Are Misguided

29.    Plaintiff does not know if her pregnancy had anything to do with the manner in which the Company responded to the robberies at the store. *See* Pl. Dep., pp., 23:6-24:4 (A23-24).

30.    The Company records show that a security guard was assigned to the store for 80 hours per week at least as of February 28, 2003.  *See* Email from Regional Loss Prevention Manager dated February 28, 2003 and screenshot of security invoices (A38-39).

### Plaintiff's Allegations About Burke Calling Her Into Work While On Bed Rest Prove Nothing

31.    Plaintiff claims that in January 2003, Burke called her into work while she was under a doctor's orders to remain on bed rest. *See* Pl. Dep., p. 21:2-15 (A42).  Although Burke denied doing so, the Company accepted Plaintiff's story and gave Burke a written warning. *See* Counseling Process Form (A40).

### The Delaware Department of Labor Found in Favor of Trans World

32.    Plaintiff filed a charge of discrimination with the Delaware Department of Labor.  On December 30, 2004, the Department issue a No-Cause Determination and stated that, "The evidence and information provided indicates that Charging Party was discharged due to substandard work performance.  Comparative

9

information provided during the investigation indicated that Respondent applies its policies in a consistent manner, and without regard to the employee's sex and pregnancy complaint." *See* Final Determination and Right to Sue Notice (A37).

### Trans World Consistently Enforces Its Target Store Policies

33.     In the year prior to Plaintiff's discharge, Trans World terminated a male manager in Burke's district for poor shrink results. *See* DMB Aff., ¶ 17 (A89).

### ARGUMENT

**I.    SUMMARY JUDGMENT IS APPROPRIATE ON ALL OF PLAINTIFF'S CLAIMS BECAUSE PLAINTIFF CANNOT MAKE OUT THE ESSENTIAL ELEMENTS OF HER CLAIMS AND THERE ARE NO GENUINE ISSUES OF MATERIAL FACT**

Summary judgment is appropriate "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The moving party bears the burden of proving that no material issue of fact is in dispute." *Kidd v. MBNA America Bank, N.A.*, 224 F.Supp.2d 807, 810 (D. Del. 2002). "Once the moving party has carried its initial burden, the nonmoving party 'must come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986)). "If the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to judgment as a matter of law." *Id.*

Summary judgment will be warranted only if the record contains insufficient evidence to allow a reasonable jury to find in favor of the non-moving party at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon

10

reviewing all the facts and inferences to be drawn therefrom in the light most favorable to plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Revis v. Slocumb Indus.*, 814 F. Supp. 1209, 1215 (D. Del. 1993).

## II.    TRANS WORLD IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S TITLE VII, PREGNANCY DISCRIMINATION ACT AND STATE LAW DISCRIMINATION CLAIMS

### A.    Plaintiff Must Meet A Rigorous Standard To Prove Discrimination

Plaintiff claims she was discriminated against on the basis of her sex and pregnancy because: (1) management did not provide adequate staffing at the store; (2) management did not provide adequate security at the store; (3) Schlifke was held accountable for losses in the store, when such losses were the result of theft and robbery; (4) she was required to disregard her physician's orders and cover employee shortages; and (5) she was terminated for reasons beyond her control. For all of these disparate treatment-type claims, the *McDonnell Douglas* framework is applicable, as Plaintiff's claims are based on indirect evidence of discrimination. *See McKay v. Delaware State University*, 2000 WL 1481018, at *7 (D. Del.) (applying the *McDonnell Douglas* framework where there was no direct evidence of discrimination) (Exhibit A hereto).

Plaintiff's sex and pregnancy discrimination claims are based on Title VII, the Delaware Discrimination in Employment Act and the Pregnancy Discrimination Act. Delaware analyzes claims of employment discrimination under the same standards as Title VII claims; therefore, all of Plaintiff's sex and pregnancy discrimination claims in Counts I, II and V will be analyzed under the Title VII framework. *See Giles v. Family Court*, 411 A.2d 599, 601 (Del. 1980) (holding that violations of Delaware discrimination law are analyzed under the same test as Title VII claims); *Cannon v. State of Delaware*,

11

523 F. Supp. 341, 344 (D. Del. 1981) ("Delaware State law prohibits employment discrimination in terms almost identical to Title VII itself"); *Rhett v. Carnegie Center Associates,* 129 F.3d 290 (3d Cir. 1997) (analyzing Pregnancy Discrimination Act claim under Title VII principles).

In order to establish a claim of disparate treatment, a plaintiff must offer evidence "adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *EEOC v. Metal Service, Co.*, 892 F.2d 341, 348 (3d Cir. 1990). Disparate treatment claims brought under Title VII are analyzed using the burden shifting analysis established in *McDonnell Douglas Corp v. Green.* 411 U.S. 792 (1973). Under this analysis, Plaintiff must first establish a *prima facie* case of sex and pregnancy discrimination under Title VII. In order to state a case based on discrimination, Plaintiff must prove that: (1) she is a member of a protected class; (2) she suffered some form of adverse employment action; and (3) this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly situated person not of the protected class is treated differently. *Miller v. Town of Milton*, 2005 WL 549531, at *6 (D. Del.) (Exhibit B hereto) (citing *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 409 (E.D. Pa. 2000) and *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999)). Once the plaintiff has established a *prima facie* case of discrimination, the burden then shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Thereafter, the burden shifts back to the plaintiff who must show that the nondiscriminatory reason articulated by the defendant is in fact a pretext for discrimination. *Id.* at 804.

12

Once the defendant has articulated a nondiscriminatory reason for the employee's rejection, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). "Speculation and belief are insufficient to create a fact issue as to pretext. Nor can pretext be established by mere conclusory statements of a plaintiff who feels that she has been discriminated against." *Seabrook v. Gadow*, 2003 WL 2138719 (D. Del.) (Exhibit C hereto). "To avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action." *Id.* Thus, to make a sufficient showing of pretext, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's reason that "a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 765. "[T]he question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1109 (3d Cir. 1997).

Notwithstanding the shifting burdens under the *McDonnell Douglas* test, the ultimate burden of persuading the finder of fact that the employer intentionally discriminated remains at all times with the Plaintiff. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

13

**B.    Plaintiff's Sex and Pregnancy Discrimination Claims Fail As A Matter of Law**

Plaintiff's claim that she was subjected to discipline and discharged because of her sex and pregnancy fails as a matter of law because: (1) she cannot meet her *prima facie* burden; (2) Trans World disciplined her for legitimate, non-discriminatory reasons; and (3) there is no evidence that its reasons are pretextual.

**1.    Plaintiff Cannot Meet Her Prima Facie Burden**

With respect to the *prima facie* case, Trans World does not dispute, for the purposes of this motion only, that Plaintiff can meet the first element (membership in a protected class) on all her claims. But, Plaintiff cannot show that the Company's staffing decisions, security procedures or a single incident where she was asked to work constitute adverse employment actions. Moreover, the discipline she received and, ultimately, her discharge did not occur under circumstances giving rise to an inference of unlawful discrimination.

**a.    Plaintiff's Staffing Claim is Without Merit**

Plaintiff claims her store was inadequately staffed in terms of its complement of assistant managers. Although not explicitly stated, her argument seems to be that Trans World intentionally limited the number of managers, which in turn had an adverse impact on her ability to manage the losses from her store. These losses, among other shortcomings, led to her discharge. However, these actions neither constitute adverse employment actions nor give rise to an inference of discrimination.

The United States Supreme Court has defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change of benefits."

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1301 (3d Cir. 1997) (unsubstantiated oral reprimands and unnecessary derogatory comments are not serious and tangible enough to constitute adverse employment actions); *Nelson v. Upsala College*, 51 F.3d 383, 388 n.6 (3d Cir. 1995) (an adverse employment action involves some harm to an employee's employment opportunities).

Whether the Company failed to hire assistant managers is not an adverse employment action as defined by the U. S. Supreme Court. There was no change in Plaintiff's employment status and, therefore, even assuming there was a reluctance to hire it cannot be the basis for a *prima facie* case of discrimination.

Aside from the fact her argument does not meet the requisite legal standard, the facts do not support her contention. Plaintiff testified the Company hired at least two assistant managers during the January to May time frame that Plaintiff cites as the period in which she was left shorthanded. *See* Statement of Facts, ¶ 27. She was also told that interviews were conducted during that time and has no reason to doubt this is true. *Id.* Therefore, Plaintiff is simply wrong that there was any "scheme" to limit the number of assistant managers in the store; this is belied by the Company's hiring patterns.

Moreover, although Plaintiff casts blame on Burke for not trying to find substitute managers to help her, she admits that when she asked other stores for help, she was rebuffed. *See* Statement of Facts, ¶ 28. She admits that other stores did not like to share their assistant managers. *Id.* She has no evidence that the alleged inability to staff the store to its fullest is linked to a discriminatory motive in any way. Indeed, when asked for evidence in support of her theory, Plaintiff merely relies on her "belief" that she

15

was treated differently. *See* Plaintiff's Dep. 37:19-39:18 (A45a-c). Such speculation is not evidence of discrimination.

Plaintiff has not and cannot offer any admissible evidence that would establish or support an inference of unlawful discrimination in connection with the Company's staffing patterns.

### b.    Plaintiff's Security Argument Fails

Plaintiff claims that she was discriminated against because Trans World did not provide adequate security at the store. Like her argument about staffing, Plaintiff is trying to deflect the attention away from her own managerial shortcomings by blaming the alleged security deficiencies as the reason for the store's poor shrink percentage. As with her staffing argument, Plaintiff cannot show that any security concerns rose to the level of adverse employment actions.

Plaintiff also cannot establish that any alleged lack of security had anything to with her sex or pregnancy. Indeed, when asked that question at her deposition, Plaintiff responded that she did not know if her pregnancy had anything to do with the manner in which the Company responded to the robberies at the store. *See* Statement of Facts, ¶ 29.

Moreover, the objective evidence demonstrates Plaintiff is simply wrong that the store lacked security measures. Although she now claims that no security measures were taken after robberies in January and February 2003, the Company's records show that a security guard was assigned to the store for 80 hours per week at least as of February 28, 2003. *See* Statement of Facts, ¶ 30. Plaintiff provided the name of the security company to the Company in an email dated February 20, 2003. *Id.*

In short, the store was provided with security measures to prevent theft and safeguard the employees. Even if this were not the case, Plaintiff has no evidence that the lack of any alleged security measures was attributable or linked in any way to her sex or pregnancy.

### c.    The Disciplinary Warnings Given to Plaintiff are Non-Discriminatory

Plaintiff cannot show that the discipline she received occurred under circumstances that give rise to an inference of unlawful discrimination. Each of the times Trans World disciplined Plaintiff, it was documented by Plaintiff's supervisors. *See* Statements of Fact, ¶¶ 11, 13, 17, 18. The documentation from those instances of discipline establishes that a process was followed each time and that Plaintiff was informed of the infraction, advised of the consequences of continued failures, and given ample time to improve. *Id.* The disciplinary process is the definition of process and fairness.

Plaintiff has not offered and cannot offer any admissible evidence that would establish or support an inference of unlawful discrimination in connection with her discipline. The only attempt Plaintiff has made to challenge the discipline she received is to claim without foundation that other store managers had poor shrink figures, but were not disciplined. Yet, Plaintiff admits she is not sure of the exact figures and does not know if she was treated differently with regard to discipline imposed for not meeting Company standards. *See* Statements of Facts, ¶ 25. This is insufficient to support an inference of discrimination for the purposes of establishing a *prima facie* case of disparate treatment discrimination.

17

### d.   Being Required to Work While on Bed Rest on One Occasion Is Not an Adverse Employment Action

Plaintiff claims that in January 2003 Burke called her into work while she was under a doctor's orders to remain on bed rest.  *See* Statement of Facts, ¶ 31. Although Burke denied doing so, the Company accepted Plaintiff's story and gave Burke a written warning.  *Id.*  This incident is not sufficiently severe as to constitute an adverse employment action and, therefore, Plaintiff cannot establish her prima facie case using this incident as evidence.

There is no debate that assuming Burke called Plaintiff into work while she was on bed rest, he was wrong.  That is why he was disciplined by Trans World. However, having to work on one occasion when she should not have had to do so is not an adverse employment action upon which a discrimination claim may be brought. Moreover, the Company's reaction to the incident demonstrates Trans World's commitment to treat its employees fairly and appropriately.

### e.   Plaintiff Cannot Demonstrate a *Prima Facie* Case with Regard to her Discharge

Plaintiff cannot show that her discharge occurred under circumstances that give rise to an inference of unlawful discrimination.  Plaintiff was ultimately discharged due to her poor record of performance and inability to improve her store's shrink figures to acceptable levels.  *See* Statements of Facts, ¶¶ 11, 13, 17, 18, 23.  Under the Company's Target Store policy, a store and its manager are placed on probation if the shrink result is .5% or higher than the stated shrink goal.  Plaintiff's two consecutive shrink results were -8.3% and -10.7% respectively, dramatically worse than the stated shrink goals.  The Company's Target Store Policy states: "Any Store Manager whose shrinkage in their store exceeds an acceptable level (0.5% over goal) will be issued a

written warning and will be placed on probation pending the outcome of the next consecutive inventory. A high shrinkage result on the next inventory will result in severe disciplinary action up to and including termination." *See* Statement of Facts, ¶¶ 10, 23.

Plaintiff's violations of these Company standards were well-documented and supported by objective data. There is simply no admissible evidence that would give rise to an inference that Plaintiff was discharged based on her sex or pregnancy.

### 2.    Trans World Acted With Legitimate and Non-Discriminatory Reasons

Even if Plaintiff were able to make out her *prima facie* case of disparate treatment, Trans World acted with legitimate and non-discriminatory reasons. As explained in detail in the Statement of Facts, Trans World disciplined Plaintiff for her poor results on the Customer Service Shop reports. Her poor inventory control resulted in extremely high shrink levels and she was warned that continued failures in this regard would result in her discharge. *See generally* Statements of Facts, ¶¶ 11, 13, 17, 18. These are legitimate and non-discriminatory reasons, backed up with documentation and other support. *Id.*

### 3.    Plaintiff Cannot Establish that Trans World's Reasons are Pretextual

To show that Trans World's proferred reasons for the discipline she received and for her discharge are a pretext, Plaintiff must demonstrate such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in those reasons that a reasonable fact finder could rationally find them unworthy of credence. *See Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

It is fatal to Plaintiff's discrimination claim that she has no admissible evidence to call Trans World's reasons for disciplining her or, ultimately, terminating her

employment, into question. Plaintiff clearly believes that she was targeted for excessive discipline. But, her belief is not enough. At most, the only offering Plaintiff can make to call the legitimacy of the Company's decisions into question is to claim that other store managers had similarly poor inventory results, yet were not fired. Her argument fails, however, because it is based solely on conjecture and rumor.

Plaintiff offers no specifics in terms of those to whom she would like to compare himself. Instead, she merely identifies one other store manager (Scott McCoy), but admits that she does not know how big his store was or what his shrink percentage was. *See* Statement of Facts, ¶ 25. She admits that she never saw, on paper, the performance of other store managers and does not know what disciplinary action other managers might have received. More telling is the fact that she admits that she knew she would be subject to discharge if her shrink level was not acceptable, that her shrink levels exceeded Company standards and that she accepted responsibility for those poor numbers. *See* Statement of Facts, ¶¶ 7, 12.

The burden of persuading the finder of fact that the employer intentionally discriminated remains at all times with the Plaintiff. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). Plaintiff cannot meet her burden by vaguely stating that she believes other managers had poor inventory results and stating, in conclusory fashion, that they were not disciplined. "Speculation and belief are insufficient to create a fact issue as to pretext. Nor can pretext be established by mere conclusory statements of a plaintiff who feels that [she] has been discriminated against." *Seabrook*, 2003 WL 21383719, at *7 (Exhibit C hereto).

The facts of this case are quite similar to those in *Seabrook*, a case in which the district court granted summary judgment to the employer. *Id.* The plaintiff in *Seabrook* claimed that "the disciplinary actions against her and the denial of [leave] were not consistent with the treatment of other [employees]," and that "racial discrimination caused her to be subjected to more severe disciplinary actions than white male [employees]." *Id.* at *6. The court dismissed this claim because the plaintiff failed to present evidence that other employees were treated in a more favorable manner. *Id.* at *6-7. In the alternative, the court dismissed the claim because "given plaintiff's numerous violations of . . . protocol . . . and directives from her supervisors, defendants have demonstrated sufficient cause for plaintiff's [adverse employment action]." *Id.* at *7.

As in *Seabrook*, this case also warrants entry of summary judgment against the employee. Because Plaintiff has not established her *prima facie* case, nor has she put forth sufficient admissible evidence of pretext, Plaintiff's disparate treatment claims in Counts I, II and V must fail.

## III.    TRANS WORLD IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### A.    Plaintiff's Intentional Infliction Claim is Preempted by Workers' Compensation Exclusivity

Plaintiff's intentional infliction of emotional distress ("IIED") claim (Count III) is barred by the Delaware Worker's Compensation Act, which provides the exclusive remedy for employees injured at work. 19 Del. C. § 2304; *see Konstantopoulos v. Westvaco Corp.,* 690 A2d 936 (Del. 1996) (19 *Del. C.* § 2304 limits an employee's recovery for personal injuries arising out of and during the course of employment to the

compensation provided under the Act, thereby excluding all other claims against the employer). As Plaintiff alleges that her emotional distress arises from her employment, her remedy rests solely under the state's Workers' Compensation laws.

**B.    Plaintiff Cannot State a *Prima Facie* Case of Intentional Infliction of Emotional Distress**

Under Delaware law, the requirements for a claim of intentional infliction of emotional distress are as follows: "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Mattern v. Hudson*, 532 A.2d 85, 85 (Del. Super. Ct. 1987). In *Mattern*, the Delaware Superior Court defined "extreme conduct" as conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as . . . utterly intolerable in a civilized community." *Id.* at 86 (citing Restatement (Second) Torts § 46, cmt.d). In addition, "the distress requirement is met where the distress inflicted 'is so severe that no reasonable man could be expected to endure it.'" *Mandelaka v. Boyd*, 1993 WL 258798 (Del. Super. Ct.) (quoting *Mattern*, 54 A.2d at 86), *affirmed*, 633 A.2d 372 (Del. 1993)

In the present case, Plaintiff has only set forth a factual scenario that is repeated in every employment dispute: an employee is disciplined for failure to meet standards, fails to improve and is discharged. There is nothing alleged in Plaintiff's Complaint or in her deposition testimony that even comes close to being "beyond all possible bounds of decency." Thus, Schlifke has not sufficiently stated a claim for intentional infliction of emotional distress against Trans World.

## IV.    TRANS WORLD IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FMLA RETALIATION CLAIM

In Count IV, Plaintiff alleges that Trans World discharged her in retaliation for her attempt to exercise her right to take leave pursuant to the Family and Medical Leave Act ("FMLA"). To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. *Abramson v. William Paterson College of New Jersey*, 260 F.3d 286 (3d Cir. 2001). "[T]emporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000).

Trans World is entitled to summary judgment on Plaintiff's retaliation claim because there is no causal link between Plaintiff's intention to take leave and the termination of her employment. Plaintiff told Burke she was pregnant in October 2002 (A43). She was not discharged until May 2003. If the fact that Plaintiff was going to be taking an FMLA leave was a cause for Burke to retaliate against her, then it makes no sense that he would wait as long as he did. Moreover, Plaintiff's argument is premised on the assumption that Burke made the decision to discharge her. This is not the case. Lauritsen, Burke's supervisor, recommended that Plaintiff be fired and Deb Markowitz-Best, the Director, Associate Relations and Staffing, made the decision to terminate Plaintiff's employment. *See* Statement of Facts, ¶ 24. As Plaintiff has made no allegations of discriminatory animus against Lauritsen or Markowitz-Best, her argument falls apart.

23

It also would make no sense for Trans World to prepare lengthy disciplinary warnings and performance improvement plans if the intent were to discharge Plaintiff before she took her leave. In addition, the bases of those warnings were objective inventory results that Plaintiff cannot dispute.

What does make sense, however, is that the final inventory results were released in late April and that those results showed that Plaintiff's performance was still well below acceptable levels. She had been told by Lauritsen when the preliminary results were released in February that if the final results bore out her failures, she could be discharged. Thus, the handwriting was on the wall long before her impending FMLA leave. Only the Company's policy of waiting for the final results delayed her discharge and thereby created her only tenuous argument: the proximity of her discharge to her leave. As stated in <u>Farrell</u>, however, this is insufficient evidence to sustain her claim.

Trans World did not cause Plaintiff to fail two inventories or to fail two Customer Service Shops. Plaintiff's retaliation claim fails as a matter of law because there is no causal connection between the timing of her FMLA leave and the termination of her employment.

## CONCLUSION

Wherefore, for the foregoing reasons, Trans World Corporation respectfully requests that this Court grant its Motion for Summary Judgment, and dismiss all of Plaintiff's claims with prejudice.

POTTER ANDERSON & CORROON LLP

By _____
Jennifer Gimler Brady (Del. 2874)
Sarah E. DiLuzio (Bar I.D. #4085)
Hercules Plaza, Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000 – Telephone
jbrady@potteranderson.com – Email
sdiluzio@potteranderson.com – Email

*Attorneys for Trans World Corporation*

OF COUNSEL:

Tyler A. Brown, Esquire*
Jackson Lewis LLP
8614 Westwood Center Drive, Suite 950
Vienna, Virginia 22182
Telephone: (703) 821-2189
Facsimile: (703) 821-2267

* Admitted *Pro Hac Vice*

Dated:  May 26, 2006