# UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF DELAWARE

| | |
|---|---|
| **KRISTIE MARIE SCHLIFKE** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **C.A. No. 1:05-cv-00620-SLR** |
| ) | |
| ) | |
| **COCONUTS MUSIC AND MOVIES** ) | |
| **AND TRANS WORLD** ) | |
| **ENTERTAINMENT CORPORATION,**) | |
| ) | |
| **Defendant.** ) | |

## APPENDIX IN SUPPORT OF PLAINTIFF'S REPLY BRIEF IN OPPOSITION TO TRANS WORLD ENTERTAINMENT CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Joseph J. Longobardi (Bar I.D. #2231)
LONGOBARDI LAW OFFICE
1303 Delaware Avenue
Suite 105
Wilmington, DE 19806
(302) 575-1502- Telephone
(302) 575-1506- Facsimile
longobardilaw@comcast.net – Email

*Attorney for Plaintiff, Kristie Marie Schlifke*

Dated: July 12, 2006

## Table Of Contents

<u>Documents</u>

B1-7.    Plaintiff's deposition transcripts

B7-8.    Dr. Fann's Notes

B9-11.  Plaintiff's deposition transcripts

B12.      Defendant's security billing statement

B13-19.  Plaintiff's deposition transcripts

B20-25.  Defendant's discovery response

B26.       Monster.com ad

B27-28.  Plaintiff's deposition transcript

Kristie Marie Schlifke                                    March 7, 2006
                        Wilmington, DE

32

1    store from the day I was hired.  I didn't walk in

2    and turn it into a target store.

3              It was, as far as Rob Burke was concerned,

4    well-known that there were theft issues, both

5    internally and externally in that store.  I had

6    watched other managers, male managers, in which also

7    worked for the company have inventories, shrink

8    results in larger amounts than I had, on a

9    continuous basis.  They were warned but not

10   terminated.

11             The gentleman that trained me, I cannot

12   tell you his last name, I want to say his first name

13   was Darryl or Darrow or to that effect, was running

14   a Philadelphia store that was a target store that

15   had continually had bad inventories.  He was I think

16   on his fourth or fifth at the time of me being

17   trained.  And he was not terminated.

18             I had two.  And it was not a hidden secret

19   that the store had issues both internally and

20   externally. I had requested on numerous accounts

21   better security measures for that store because the

22   store was in such a bad location.

Kristie Marie Schlifke                                    March 7, 2006
                    Wilmington, DE

33

1          There was an alleyway directly next to the

2     store where, that's where most of your snatch and

3     grab people would run out, and it was, the store was

4     well-known for free CDs and DVDs by the local

5     community.

6          I had informed Rob Burke of this.  Until

7     after we were robbed at gun point and my employees

8     called to complain, no security measures were ever

9     taken in that store, where some of the other high-

10    crime area stores had cameras or other better

11    measures as far as payroll.

12         We were running a very limited payroll in

13    that store because the sales were not high, which is

14    understandable, but it was a fairly large store for

15    a two-person crew to be working all the time, to

16    maintain the security issues and the sales issues

17    that needed to be addressed on a daily basis in that

18    store.  Where some of the other stores always seemed

19    to have a whole lot more help in them than my store

20    ever did.

21         Now, I understand it is a sales to payroll

22    ratio, and it has got to be a profitable store.  But

Kristie Marie Schlifke                    March 7, 2006
                    Wilmington, DE

135

1    in November, which is based on a shrink result of

2    8.3 percent.  And it says another bad shrink result

3    and you could be fired.  Right?  Do you remember

4    that?

5        A.    That was in --

6        Q.    That was November.

7        A.    Yes, yes.

8        Q.    Okay.  Then come February, you get the

9    preliminary shrink result, says it is 10.7 percent,

10   which is now still worse than November?

11       A.    Correct.

12       Q.    So at that point you knew, uh-oh, my job

13   is really in jeopardy here, right?

14       A.    No.

15       Q.    Why not?

16       A.    Considering the circumstances surrounding

17   the store and the fact that we had terminated so

18   many internal theft issues, been robbed and

19   burglarized, I did not feel that that was a

20   controllable environment that the manager was

21   responsible for.

22            Me as a store manager cannot prevent a

Kristie Marie Schlifke

March 7, 2006

Wilmington, DE

136

1    gentleman coming in with a gun, robbing the store.

2    So, no, I wasn't that worried, because I had asked

3    Rob Burke, blatantly, if I had a reason to be

4    worried, and he always reassured me that I didn't.

5        Q.    Except that you had a conversation with

6    Alan Lauritsen in April in which he told you that if

7    the final shrink results were, in fact, 10.7 percent

8    you would be terminated, correct?

9        A.    No.

10       Q.    You never had that conversation with Mr.

11   Lauritsen?

12       A.    Not with those words.

13       Q.    What were the words?

14       A.    I cannot remember them.

15       Q.    He made it clear to you that if the final

16   results were, in fact, 10.7 percent, that your job

17   would be forfeited, that you would lose your job,

18   that you would be fired, words to that effect?

19       A.    No.    I did not actually even speak to Alan

20   about the inventory itself.    Me and Alan spoke about

21   the store conditions and the things that were

22   happening in the store.    I did not speak to Alan

Kristie Marie Schlifke

March 7, 2006

Wilmington, DE

22

1      Q.   In what ways?

2      **A.   His tone, his attitude, the way he spoke**

3  **to me, not only in front of other employees but in**

4  **front of other management staff as far as other**

5  **stores.**

6      **It was almost as if I had made him mad**

7  **from that point on.**

8      Q.   When did you tell Mr. Burke?

9      **A.   That I was pregnant?**

10     Q.   Yes.

11     **A.   He was notified in October.**

12     Q.   Do you remember when in October?

13     **A.   At the end of October.  I can't recall on**

14  **a specific date.**

15     Q.   Anybody present when you told him?

16     **A.   No.  It was a telephone conversation.**

17     Q.   What did he say when you told him?

18     **A.   "You are kidding."**

19     Q.   What else did he say?

20     **A.   "Congratulations are in order."  That was**

21  **pretty much it.**

22     Q.   Did you tell him when you were due?

Kristie Marie Schlifke

March 7, 2006

Wilmington, DE

20

1    your employment. In what ways do you believe that

2    you were discriminated against on the basis of your

3    pregnancy during your employment?

4        A.    I was continually understaffed from the

5    point of January on.  Management understaffed, let

6    me rephrase that.

7              Because we were understaffed I was working

8    an average of 50 to 60 hours a week, when I had

9    asked for help on many occasions.

10             I had notified both Rob Burke and HR that

11   I was not to be working these type of hours, those

12   type of hours.  And there was never any resolution

13   to the fact that I was working with only one

14   assistant manager for almost, approximately a four-

15   month period.

16             From the point that Marcus Mason was

17   terminated, back on January 8th, I constantly only

18   had one assistant manager in that store.

19             When I had asked for help, it was very

20   difficult to get any type of resolution to my

21   problem.  I never received help from any other

22   stores, nearby stores, as far as on a weekly basis

# *Women to Women Ob/Gyn Associates*

Nancy Fan, M.D.
Shauna B. McIntosh, M.D.

**Albert Dworkin, M.D., PA**

213 Greenhill Ave., Suite B
Wilmington, DE 19805
Phone (302) 778-BABY
Fax    (302) 778-2250

February 25, 2003

To Whom It May Concern:

Kristie Schlifke is under my care for her pregnancy.  Her due date is 6/4/03.  The patient was on home rest for Jan 8-9 due to preterm contractions.  Please excuse her absences.

If there are any questions, please contact us at the above.

Sincerely,

NANCY FAN, M.D.

B7

# *Women to Women Ob/Gyn Associates*

Nancy Fan, M.D.
Shauna B. McIntosh, M.D.

**Albert Dworkin, M.D., PA**

213 Greenhill Ave., Suite B
Wilmington, DE 19805
Phone (302) 778-BABY
Fax   (302) 778-2250

February 25, 2003

To Whom It May Concern:

Kristie Schlifke is under my care for her pregnancy.  Her due date is 6/4/03.  I think it is medically recommended that Kristie only work an 8 hour shift at a time for only 5 days a week for a total of 40 hours/week.

If there are any questions, please contact us at the above.

Sincerely,

NANCY FAN, M.D.

B8



DEPOSITION
EXHIBIT
PENGAD 800-631-6989
Schlifke 1
DP 2/7/06

Kristie Marie Schlifke

March 7, 2006

Wilmington, DE

21

1    to give me a day off or my other assistant manager.

2          I was brought into work when I was

3    supposed to be out on bed rest on January 8th, the

4    date that Marcus Mason was terminated, when I had

5    begged and pleaded with Rob to let me stay home.

6    And I came into the store that evening and was

7    humiliated, embarrassed and scolded as a child in

8    the middle of my sales floor, because I wasn't

9    allowed to be home on bed rest, while I was

10   terminating my assistant manager.

11         He had been notified the day before that I

12   was going to be taking two days off, because of

13   having pre-term labor contractions.  He was both

14   verbally told and I e-mailed him that day, because I

15   had to adjust my schedule to cover my hours.

16         That's a few of the incidents.

17   Q.    What are the others?  And understand, I'm

18   not talking so much about incidents.  I want to know

19   why you believe that you were discriminated against

20   because of your pregnancy.

21   A.    From the point of me telling Rob Burke

22   that I was pregnant I was treated differently.

Kristie Marie Schlifke                                    March 7, 2006
                        Wilmington, DE

                                                                    24

1     feel safe.

2                We had been robbed and no security

3     measures were put into place until after being

4     robbed and burglarized again.

5          Q.    When were you robbed?

6          A.    Which time?

7          Q.    When was the first time?

8          A.    End of January, beginning of February.

9     That was when we were robbed at gun point.  We had

10    been robbed previous times with what I would call

11    snatch and grabs, people pushing you aside to get

12    out the front door with arms full of merchandise.

13    That happened on a constant basis in that store.

14                I had been advised that I was no longer

15    allowed to chase after them, because that's what I

16    did at first, and I actually had received

17    restitution for the company by having some of them

18    arrested.  But at that point then I was told I was

19    not allowed to do that for the safety of myself, and

20    so I no longer did that.

21                But there were incidents at least once to

22    twice a week, ongoing in that store, of that nature,

Kristie Marie Schlifke

March 7, 2006

Wilmington, DE

26

1    A.    We were robbed twice at gun point.

2    Q.    When was the other time?

3    A.    Approximately, I think it was six days

4    after the first robbery.  It was done by the same

5    gentleman who was arrested.  And there was a

6    burglary where somebody smashed in the front window,

7    and I cannot recall the date of that.  It was in

8    that same January to February time frame.  They

9    broke down the window.  I actually arrived at the

10   store that morning, and the front door, glass window

11   was broken down.  An alarm had never gone off.  We

12   didn't know until that morning that the store had

13   been burglarized.

14   Q.    The two robberies that you mentioned, end

15   of January/beginning of February, and then again six

16   days later, the robber took cash?

17   A.    And CDs, from my recollection.  DVDs.

18   Merchandise.

19   Q.    Both times?

20   A.    I know for positive the first time.  I'm

21   not a hundred percent positive about the second

22   time.

Actual Vendor 52370  DIAMOND STATE SECURITY     Invoice . .

V=View

| Typ/Invoice | Remit | Inv date | Due date | Description | P | M | Store | Gross Amt |
|---|---|---|---|---|---|---|---|---|
| _ I 1608 | 52370 | 2/28/03 | 3/27/03 | PO# | D | Y | 1584 | 3152.00 |
| _ I 1671 | 52370 | 3/29/03 | 4/29/03 | PO | D | Y | 1584 | 4184.00 |
| _ I 1754 | 52370 | 5/31/03 | 6/30/03 | PO | D | Y | 1584 | 7360.00 |
| _ I 1801 | 52370 | 6/26/03 | 7/26/03 | PO | D | Y | 535 | 2936.00 |
| _ I 1881 | 52370 | 7/25/03 | 8/25/03 | PO | D | Y | 1584 | 3280.00 |
| _ I 1903 | 52370 | 8/20/03 | 9/19/03 | PO# | D | Y | 1584 | 3176.00 |
| _ I 1990 | 52370 | 10/06/03 | 11/06/03 | PO | D | Y | 1584 | 1480.00 |
| _ I 1991 | 52370 | 10/06/03 | 11/06/03 | PO | D | Y | 1584 | 1376.00 |
| _ I 2019 | 52370 | 10/28/03 | 11/28/03 | PO | D | Y | 1584 | 2872.00 |
| _ I 2073 | 52370 | 12/11/03 | 1/10/04 | PO# | D | Y | 1584 | 2056.00 |

Bottom

F3=Exit    F7=Page back    F15=History    F16=Sort
Past due documents are highlighted.

B12

TW0343

Kristie Marie Schlifke

March 7, 2006

Wilmington, DE

134

1    **prior to getting, receiving that e-mail.**

2        Q.    And in fact, you knew, just as you had

3    known before in the previous inventory, you know the

4    day the inventory is conducted what the preliminary

5    number comes out to, right?

6        **A.    Correct.**

7        Q.    And that was done in February, right?

8        **A.    February 4th, 2003 was the inventory date,**

9    **yes.**

10        Q.    All right.  And so you knew on February

11    4th that your shrink results had, in fact, gotten

12    worse than the inventory from the previous

13    inventory?

14        **A.    Yes.**

15        Q.    And you knew that when you had received

16    the Counseling Process Form that was the written

17    warning, which said that another bad inventory could

18    result in termination, when you got that 10.7

19    percent shrink figure, you knew your job was very

20    much in jeopardy at that point, correct?

21        **A.    Say that again.**

22        Q.    Sure.  You get the final written warning

Kristie Marie Schlifke                                March 7, 2006
                         Wilmington, DE

                                                                    41

1    in the beginning of April.  And was confused when he

2    seen it because he knew that we were looking for

3    assistant manager help.  He was actually interested

4    in at one point coming over to the Coconuts store.

5           I was very confused with what he was

6    telling me, that it was management, not an assistant

7    manager's position posted on monster.com, and he

8    told me that he had heard from the manager from the

9    FYE store, the female manager -- I cannot recall her

10   name -- that they had planned on getting rid of me

11   right before I had the baby.

12          So that's when, in turn, I called Rob that

13   day and had an outright conversation with him and

14   asked him if he was planning on terminating me, and

15   he reassured me no, and told me that the reason that

16   there was an ad posted on monster.com was because

17   they had just terminated a bunch of people from the

18   FYE store, and then he again reassured me that there

19   was nothing to be worried about, and that the only

20   position he was looking for was an assistant

21   management position for our store.

22          Q.   Did Ben tell you anything else?

Kristie Marie Schlifke

March 7, 2006

Wilmington, DE

45

1    gentleman's exact words were, I was scheduled to

2    start my maternity leave June 2nd and he said, "You

3    are not going to make it to June 2nd.  They won't

4    let you go out on maternity leave."

5        And Ben had said the one time, the time

6    actually --

7    Q.   Who is it that said they won't let you go

8    out on maternity leave?

9    A.   Hold on one second, please.

10   Q.   You are referring to the document that

11   your attorney produced this morning entitled

12   "Incidents" that we spoke about earlier, correct?

13   A.   One of them, yes.  Ben actually came into

14   the store more than once.  Can you repeat your

15   question?

16   Q.   Sure.  You said that somebody told you

17   that the company was not going to let you go on

18   maternity leave. Who was that?

19   A.   That was -- sorry.  That was, I want to

20   say his name is Chris, but I cannot recall.  He was

21   tall and skinny.  And he worked for the Saturday

22   Matinee.  That's all I can tell you.

Kristie Marie Schlifke

March 7, 2006

Wilmington, DE

97

1    leave?

2        **A.    I cannot recall.**

3        Q.    Did you ever fill out any paperwork that -

4    - that's probably obvious by your answer, but I'll

5    ask anyway.  Do you recall filling out any FMLA

6    paperwork?

7        **A.    No, I don't recall.**

8        Q.    Other than discussing your FMLA

9    eligibility with the individual who called you, did

10    you have any discussions with anybody in management

11    about taking FMLA leave?

12        **A.    Rob Burke.**

13        Q.    When did you discuss that with Rob?

14        **A.    I cannot recall a date.  I would say it**

15    **was in my third trimester, towards the end of my**

16    **pregnancy.  We discussed when my maternity leave**

17    **would be starting, how long I would be out for, the**

18    **measures that we were going to take to cover my**

19    **store while I was out on leave, and when I would be**

20    **returning back to work then.**

21        Q.    It sounds like that must have been after

22    you got the call about FMLA eligibility; is that

Kristie Marie Schlifke                                    March 7, 2006
                        Wilmington, DE

98

1     fair to say?

2          A.    Actually, no, I believe it was prior.    I

3     wanted to get my eggs in a basket, letting him know

4     when I would be leaving or my tentative date, and

5     when I would be returning, to make sure that the

6     store would be covered while I was away.

7          Q.    At that point when did you tell him that

8     you anticipated taking your leave?

9          A.    My original leave date?    I was not

10    planning to leave to go out on maternity leave until

11    June 2nd, was the date I had originally told him.

12         Q.    When you had this discussion with Mr.

13    Burke about when your leave would start, how long

14    you would be out, etcetera, what did he say?

15         A.    He said that that would be fine, no

16    problem, that the store would be covered by the two

17    assistant managers that were in the store, and they

18    would be overseen by the training store manager who

19    at the time was Scott McCoy, that he would be

20    checking in on them frequently throughout the weeks

21    to make sure things were running smoothly, and if

22    they had any problems or concerns, that's who they

Kristie Marie Schlifke                        March 7, 2006
                        Wilmington, DE

16

1    written documentation which describes what the

2    company's policy is with regard to what happens with

3    health benefits upon termination?

4         A.    After I was terminated?

5         Q.    At any time.  Have you ever seen any

6    written documentation that talks about that?

7         A.    Just their initial health packet that I

8    was issued when I got my health benefits, which was

9    a year-and-a-half prior.

10        Q.    And do you recall what that packet said

11   with regard to the continuation or non-continuation

12   of health benefits for a terminated employee?

13        A.    No.

14        Q.    Do you have any reason to believe that

15   your health benefits were treated any differently

16   than any other employee who was discharged?

17        A.    Yes.

18        Q.    What reason is that?

19        A.    Because I had asked the day that I called,

20   on the day I was terminated, May 5th, I requested

21   for both to be mailed to me and faxed to me Cobra

22   paperwork so that I could Cobra my benefits, because

Kristie Marie Schlifke                                      March 7, 2006

Wilmington, DE

17

1    I needed to have health insurance, bottom line.

2              It was never mailed to me.  And I, when I

3    spoke to them they said they had 90 days to mail it

4    to me, was the response I was given.  And I

5    explained, obviously, my situation, that I would

6    like to take care of this before the baby would be

7    born, so it wouldn't be a complete mess, and asked

8    if they would fax it to me. They faxed me a copy.

9    It was not a legible copy.  I again asked for them

10   to re-fax it to me, and it was never faxed to me,

11   nor mailed to me, after that point.

12        Q.    So did you apply for Cobra?

13        A.    No.  Never received paperwork.

14        Q.    After that day did you follow up and

15   attempt to get the paperwork?

16        A.    I called approximately four days to five

17   days later, because I was denied for Medicaid.

18        Q.    Who did you speak with?

19        A.    I cannot recall that day.

20        Q.    Who did you speak with the first time when

21   you were saying, "Please fax me the paperwork"?

22        A.    That was the first gentleman, I believe

## IN THE UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF DELAWARE

| | |
|---|---|
| KRISTIE MARIE SCHLIFKE )<br><br>Plaintiff, )<br><br>v. )<br><br>COCONUTS MUSIC AND MOVIES )<br>AND TRANS WORLD )<br>ENTERTAINMENT CORPORATION, )<br><br>Defendant. ) | C.A. No. 1:05-cv-00620-SLR |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST REQUEST
## FOR PRODUCTION OF DOCUMENTS TO DEFENDANT

Defendant Coconuts Music and Movies and Trans World Entertainment Corporation serves the following responses to Plaintiff Kristie Marie Schlifke's First Request for Production of Documents.

**REQUEST NO. 1:** Please provide shrinkage reports for inventory for all stores within Region 6, District 1 for the years 2001 through 2004.

**RESPONSE NO. 1:**

Defendant objects to Request No. 1 on the grounds that it is overbroad as to time.

Without waiving said objection, Defendant will produce shrinkage reports for 2002 and

2003.

**REQUEST NO. 2:** Please provide all e-mail or other forms of electronic communications to and from Plaintiff to any other employee of the Defendant from her date of hire to her date of termination.

**RESPONSE NO. 2:**

Other than the emails already produced as part of Defendant's initial disclosures,

no further documents exist.

**REQUEST NO. 3:**  Please provide all e-mail or other forms of electronic communications between any employee of Defendant regarding Plaintiff.

**RESPONSE NO. 3:**

Other than the emails already produced as part of Defendant's initial disclosures,

no further documents exist.

**REQUEST NO. 4:**  Please provide a copy of all payroll reports for the Prices Corner store from Plaintiff's date of hire to date of termination.

**RESPONSE NO. 4:**

Responsive documents will be produced.

**REQUEST NO. 5:**  Please provide copies of all payroll reports for Plaintiff from the date of hire to date of termination.

**RESPONSE NO. 5:**

Responsive documents will be produced.

**REQUEST NO. 6:**  Please provide all termination documents for all employees of the Prices Corner store from Plaintiff's date of hire to date of termination.

**RESPONSE NO. 6:**

Defendant objects to this request on the grounds that it is vague and ambiguous.

Without waiving said objections, Defendant will produce a roster of store employees and

their dates of hire and reasons for termination.

B21

**REQUEST NO. 7:** Please provide copies of the Target Store binders for the Prices Corner store for the years 2001 through 2004.

**RESPONSE NO. 7:**

     No responsive documents exist.

**REQUEST NO. 8:** Please provide copies of the Loss Prevention binders for the Prices Corner store for the years 2001 through 2004.

**RESPONSE NO. 8:**

     No responsive documents exist.

**REQUEST NO. 9:** Please provide copies of the Human Resources binders for the Prices Corner store for the years 2001 through 2004.

**RESPONSE NO. 9:**

     No responsive documents exist.  A copy of the current HR Binder has been

produced.

**REQUEST NO. 10:** Please provide copies of the Sales and Cash Receipts binders for the Prices Corner store for the years 2001 through 2004.

**RESPONSE NO. 10:**

     No responsive documents exist.

**REQUEST NO. 11:** Please provide copies of the weekly known theft reports for the Prices Corner store for the years 2001 through 2004.

**RESPONSE NO. 11:**

     No responsive documents exist.

**REQUEST NO. 12:** Please provide copies of the weekly incident reports for the Prices Corner store for the years 2001 through 2004.

**RESPONSE NO. 12:**

     No responsive documents exist.

**REQUEST NO. 13:**  Please provide copies of the incident report binders for the Prices Corner store for the years 2001 through 2004.

**RESPONSE NO. 13:**

No responsive documents exist.

**REQUEST NO. 14:**  Please provide copies of all documents regarding the offer of COBRA benefits to Plaintiff after date of termination and its mode of transmission to Plaintiff.

**RESPONSE NO. 14:**

Defendant will produce a copy of the type of letter that was sent to Plaintiff.

**REQUEST NO. 15:**  Please provide copies of all police reports concerning the Prices Corner store for the years 2001 through 2004.

**RESPONSE NO. 15:**

No responsive documents exist.

**REQUEST NO. 16:**  Please provide copies of all electronic communications or documents concerning management staffing at the Prices Corner location from 2001 through 2004.

**RESPONSE NO. 16:**

Other than the roster of employees and payroll information provided in response

to these Requests, no other responsive documents exist.

**REQUEST NO. 17:**  Please provide copies of all electronic communications or documents concerning security measures, lack of security measures, or the implementation of security measures at the Prices Corner location from 2001 through 2004.

**RESPONSE NO. 17:**

Responsive documents will be produced.

**REQUEST NO. 18:**  Please provide copies of all termination documents from any other store manager for shrinkage problems in Region 6, District 1 from 2001 through 2004.

**RESPONSE NO. 18:**

Defendant objects to this request on the grounds that it is overbroad as to time.

With respect to the period from 2002 through 2003, no other Store Manager was

terminated in the Region for shrinkage problems.

**REQUEST NO. 19:**  Please provide copies of all electronic communications or documents regarding references, requests or inquiries from prospective employers about Plaintiff after her date of termination.

**RESPONSE NO. 19:**

No responsive documents exist.

**REQUEST NO. 20:**  Please provide copies of all electronic communications or documents regarding the Monster.com posting on or about March 2003 for Store Manager at the Prices Corner store.

**RESPONSE NO. 20:**

No responsive documents exist.

**REQUEST NO. 21:**  Please provide copies of all electronic communications or documents regarding the posting, publishing or any other form of employment opportunities for the Prices Corner store for the years 2002 and 2003 from Plaintiff's date of hire to her date of termination.

**RESPONSE NO. 21:**

No responsive documents exist.

**REQUEST NO. 22:**  Please provide all e-mail or other forms of electronic communications between any employee of Defendant regarding Plaintiff.

**RESPONSE NO. 22:**

Other than the emails already produced as part of Defendant's initial disclosures,

no further documents exist.

POTTER ANDERSON & CORROON LLP

By _____
Jennifer Gimler Brady (Del. Bar. 2874)
Hercules Plaza, Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, Delaware 19899-0951
(302) 984-6042 – Telephone
(302) 658-1192 – Facsimile
jbrady@potteranderson.com – Email

*Attorneys for Defendants Coconuts Music and
Movies and Trans World Entertainment
Corporation*

OF COUNSEL:

Tyler A. Brown, Esquire
Kimberly J. Alms, Esquire
Jackson Lewis LLP
8614 Westwood Center Drive
Suite 950
Vienna, VA  22182
(703) 821-4310 – Telephone
(703) 821-2267 – Facsimile

Dated:  April 14, 2006
PA&C-728185v1

US-DE-Wilmington-Store Manager, Coconuts

Page 1 of 1

<< BACK          Search Jobs          My Monster          Career Center          For Employers



## US-DE-Wilmington-Store Manager, Coconuts :.

**Status:**      Full Time, Employee                    **Reference Code:** SM-DE

**Job Location:** Wilmington 19808

We are looking for an experienced Store Manager for our Coconuts store in Wilmington, DE. We are one of the leaders in entertainment retail with approximately 900 stores nationwide; we offer you an opportunity to put your sales ability to work in a high energy, fun environment with products that everyone loves. Check us out at www.fye.com

You will be responsible for maximizing profits through effective management of the entire store within company guidelines, while providing customers with a positive shopping experience. You will also be building your knowledge in order to fast forward your career with us!

Preferred candidates must have:
• 1-2 years prior retail experience as a Store Manager.
• A strong dedication to customer service.
• Dynamic leadership and communication skills.
• Proven ability to recruit and develop a strong sales staff.

Trans World Entertainment offers an exceptional salary, bonus and benefits package including a generous merchandise discount. If you love music, movies and games and enjoy the excitement of retail management, we want to hear from you!

Trans World Entertainment is dedicated to diversity in the workplace. We are an Equal Opportunity Employer.

......................................................................................................................

### Contact Information :.
District Manager
rburke@twec.com
Trans World Entertainment Corporation
Click here to see all "Trans World Entertainment Corporation" opportunities
EMAIL THIS JOB TO A FRIEND
Learn more about "Trans World Entertainment Corporation"





Kristie Marie Schlifke                              March 7, 2006
                    Wilmington, DE

18

1    his name to be Jeff.  I am not a hundred percent

2    certain.

3         Q.   That was in that same conversation you

4    were testifying about earlier?

5         A.   Yes.

6         Q.   Did you ever write a letter to the company

7    saying, Please give me my Cobra paperwork?

8         A.   No.  But I spoke to Rob Burke

9    approximately, it was within 30 days, I would say

10   two to three weeks later, and requested him to have

11   it sent to me.  I didn't know who at that point to

12   call.

13        Q.   What did Mr. Burke say?

14        A.   That he would take care of it.  And I also

15   called him that day, because they still had my name

16   on their alarm panel for security, and I was getting

17   phone calls on a continual basis.  That was the

18   other reason for calling him that day.

19        Q.   And it is your testimony that despite

20   talking to Mr. Burke and him telling you that he

21   would send it to you, that no one sent you the

22   paperwork?

Kristie Marie Schlifke

March 7, 2006

Wilmington, DE

19

1    A.    No, never received it.

2    Q.    After speaking to Mr. Burke did you do

3    anything else to follow up to try to get the

4    paperwork?

5    A.    At that point, no.  I obviously gave

6    birth. Things got crazy.  I had applied for Medicaid

7    and they eventually did approve it.  So at that

8    point it wasn't worth going on any further of the

9    hassle.

10    Q.    So you talked about the fact that you were

11    discharged within days of telling Mr. Burke that you

12    were going to give birth and be out on maternity

13    leave.  You talked about the conversation that you

14    had with Jeff on the day that you were discharged.

15    Any other reasons that you believe your pregnancy

16    was the reason for your discharge?

17    A.    Other -- the main, the main reason would

18    be that within two hours of notifying him that I

19    would be leaving for maternity leave he was looking

20    for my replacement, no.

21    Q.    You spoke earlier about drawing a

22    distinction between your termination versus during

# UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF DELAWARE

| | |
|---|---|
| **KRISTIE MARIE SCHLIFKE** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **C.A. No. 1:05-cv-00620-SLR** |
| ) | |
| ) | |
| **COCONUTS MUSIC AND MOVIES** ) | |
| **AND TRANS WORLD** ) | |
| **ENTERTAINMENT CORPORATION,**) | |
| ) | |
| **Defendant.** ) | |

## CERTIFICATE OF SERVICE

I, Joseph J. Longobardi, III, hereby certify this 12th day of July, 2006, that the foregoing **APPENDIX IN SUPPORT OF PLAINTIFF'S REPLY BRIEF IN OPPOSITION TO TRANS WORLD ENTERTAINMENT CORPORATION'S MOTION FOR SUMMARY JUDGMENT** was filed with the U.S. District Court District of Delaware via CD and paper submission and two (2) true and correct copies were mailed via 1st Class U.S. Mail, postage prepaid, to the following:

Tyler A. Brown, Esquire
Jackson Lewis LLP
8614 Westwood Center Drive, Suite 950
Vienna, VA 22182

Sarah E. DiLuzio, Esquire
Potter, Anderson & Corroon, LLP
Hercules Plaza, Sixth Floor

1313 North Market Street, P.O. Box 951
Wilmington, DE 19899-0951

**LONGOBARDI LAW OFFICE**

**JOSEPH J. LONGOBARDI, III**
I.D. No.: 2231
1303 Delaware Avenue
The Plaza, Suite 105
Wilmington, DE 19806
(302) 575-1502
**Attorney for Plaintiff**