IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KRISTIE MARIE SCHLIFKE Plaintiff, v. TRANS WORLD ENTERTAINMENT CORPORATION (d/b/a COCONUTS MUSIC AND MOVIES), Defendant. | ) ) ) ) ) ) ) Civ. No. 05-620-SLR ) ) ) ) ) ) ) ) ) |

Joseph J. Longobardi, III, Esquire of Longobardi Law Office, Wilmington, Delaware. Attorney for Plaintiff.

Jennifer Gimler Brady, Esquire and Sarah E. DiLuzio, Esquire of Potter Anderson & Corroon, LLP, Wilmington, Delaware. Attorneys for Defendant. Of Counsel: Tyler A. Brown, Esquire of Jackson Lewis, LLP, Vienna, Virginia.

**MEMORANDUM OPINION**

Dated: March 27, 2007
Wilmington, Delaware

ROBINSON, Chief Judge

## I. INTRODUCTION

Plaintiff Kristie Marie Schlifke filed the action at bar against her former employer, Trans World Entertainment Corporation[1] ("defendant"), on August 23, 2005. (D.I. 1) Plaintiff's complaint alleges sex discrimination actionable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 et seq. She likewise alleges violations of the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k); the Delaware Discrimination in Employment Act ("DDEA"), 19 Del. C. §§ 710 et seq.; the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 et seq.; and claims that defendant engaged in the intentional infliction of emotional distress. (D.I. 1 at ¶¶ 23-32) Plaintiff requests compensatory damages, special damages, attorney's fees, and costs. (Id. at 5)

Presently before the court is defendant's motion for summary judgment. (D.I. 16) The court has jurisdiction over the matters at bar pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 42 U.S.C. § 2000e-5(f).

## II. BACKGROUND

On March 11, 2002, defendant hired plaintiff as the manager of the Coconuts Music and Movies retail store ("Coconuts") in Wilmington, Delaware. (D.I. 2 at ¶ 9) One of the essential responsibilities of a store manager is to "[p]rotect all corporate assets by following Loss Prevention guidelines." (D.I. 18 at A1) The store had been a target for shoplifters before plaintiff took over as manager and, subsequent to her arrival, was robbed twice at gunpoint. (D.I. 17 at 16; D.I. 22 at 3)

---

[1]Plaintiff's complaint names two defendants, "Coconuts Music and Movies" and "Trans World Entertainment Corporation." (D.I. 1 at ¶ 1) Defendant avers that Trans World Entertainment Corporation is its proper name, and that it merely does business under the name "Coconuts Music and Movies." (D.I. 17 at 1)

Prior to plaintiff's arrival, the Wilmington store was within the Target Store Program ("Target Program"). (D.I. 18 at A86) Company policy states that a store within the Target Program is one which is not meeting company expectations for maintaining low shrinkage rates. (Id. at A16) According to defendant, the term "shrink" describes loss of cash or product which decreases the store's profitability. (D.I. 17 at 4) Under Target Program policy, failure by the store manager to maintain shrinkage goals is grounds for "severe" discipline. (D.I. 18 at A18)

Defendant avers that in April 2002, shortly after plaintiff completed training and began employment, it conducted a regularly-scheduled inventory of her store. (Id. at A86) The shrink goal was -1.6%. (Id.) The inventory revealed that the actual shrink percentage for the store was -6%. (Id.) However, defendant states that plaintiff was not disciplined for the results of this inventory because she had only recently started managing the store. (Id.)

On July 30, 2002, defendant conducted a customer service assessment of plaintiff's store. (Id. A21) Defendant seeks a minimum score of 70%. (Id.) The assessment of plaintiff's store resulted in a score of only 40%. (Id.) In response to the store's poor performance, defendant issued a written warning to plaintiff on August 13, 2002. (Id.)

The next store inventory, the first one for which plaintiff was responsible, took place in August 2002. (Id. at A23) The result of this inventory indicated that the store's shrink rating had risen to -8.3%. (Id.) Plaintiff was given a written warning for this

2

negative rating;[2] however, she did not receive the warning until November 5, 2002. (Id.) Defendant states that its practice is to wait until the inventory results are finalized before issuing a warning, although preliminary results are available shortly after the inventory is taken. (D.I. 17 at 6) On November 5th, plaintiff also received a poor performance review.[3] (D.I. 18 at A24-A31) Five days later, defendant conducted another customer service assessment and the store was rated 55%, still below the acceptable rate. (D.I. 18 at A83-A84)

In October 2002, prior to receipt of the final results from the August 2002 inventory and her performance review, plaintiff informed her supervisor, Rob Burke ("Burke"), that she was pregnant. (D.I. 23 at B5) Due to complications during plaintiff's pregnancy, she was placed on a restricted work schedule by her physician. (Id. at B8) The restrictions limited her schedule to 40 hours of work per week. (Id.) Plaintiff avers that, because defendant kept the store understaffed, she was required to work 50 to 60 hours per week. (Id. at B6; D.I. 22 at 3)

In January 2003, plaintiff was put on bed rest for two days. (D.I. 18 at A40; D.I. 23 at B7) Despite this, Burke called plaintiff and required her to be present at store closing on one of those days because an assistant manager had been terminated and

---

[2]Company policy states that, "[a]ny Store Manager whose shrinkage in their store exceeds an acceptable level (0.5% over goal) will be issued a written warning and will be placed on probation pending the outcome of the next consecutive inventory. A high shrinkage result on the next inventory will result in severe disciplinary action up to and including termination." (D.I. 18 at A18)

[3]In fact, plaintiff achieved a "meets expectations" score for only three performance objectives. She was rated "below expectations sometimes" for five objectives and "below expectations consistently" for two objectives. (D.I. 18 at A24-A31)

3

store rules required that at least one manager be present for closing. (D.I. 18 at A40) Plaintiff states that she was scolded by Burke in front of her staff on that day, causing her humiliation. (D.I. 23 at B9) Defendant reprimanded Burke for his actions and placed him on written warning. (D.I. 18 at A40) Plaintiff alleges that she was told by fellow employees that defendant would not permit her to go on maternity leave and would be "getting rid" of her. (D.I. 22 at 3-4; D.I. 23 at B14-B15) However, those employees were not deposed in the case at bar and no evidence of record corroborates what plaintiff claims she was told.

The store was robbed twice at gunpoint in January 2003. (D.I. 17 at 16; D.I. 22 at 3) After those incidents, defendant placed security guards within the store. (D.I. 18 at A38-A39) The next regularly-scheduled inventory took place in February 2003. (Id. at A81) This time the shrink rating was -10.7%.[4] (Id. at A88) Again, the results were not considered final for several months, until late April or early May. (Id. at A88-A89)

Plaintiff avers that she first learned defendant was soliciting candidates to replace her in April 2003.[5] (D.I. 22 at 3) Plaintiff had intended to begin maternity leave in June of that year but, due to medical complications, she informed Burke that she would be leaving beginning May 4, 2003. (D.I. 23 at B15-B17) Plaintiff was terminated on May 5, 2003. (D.I. 18 at A89)

---

[4]There is no evidence of record that the shrink rating was adjusted in light of the gunpoint robberies.

[5]Plaintiff has attached a posting from the website Monster.com seeking a manager for the Coconuts store in Wilmington; however, the posting is not dated. (D.I. 23 at B26)

4

Plaintiff avers that she was trained by a male manager in the Philadelphia store[6] who, despite having had a similar string of bad inventories and managing a store that was part of the Target Program, was not terminated.[7]  (D.I. 23 at B1)  She further claims the company did not provide her with Cobra health benefits or comply with her request for information on obtaining Cobra benefits.  (Id. at B18-B19)  Defendant claims that any failure to provide information on Cobra benefits was an administrative error. (D.I. 27 at 1-2)

Plaintiff filed a complaint with the Delaware Department of Labor and received her right to sue letter on December 30, 2004.  (D.I. 18 at A37)  She then filed the lawsuit presently before the court.

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).  "Facts that

---

[6] Plaintiff is unsure of the manager's last name and could not recall his first name with certainty, believing it to be Darryl or Darrow.  (D.I. 23 at B1)

[7] Additionally, plaintiff argues in her answering brief that she requested shrinkage reports for all stores within the district during the period of her employment and that, while defendant indicated they would be provided for the years 2002 and 2003, those reports were not produced.  (D.I. 22 at 4; D.I. 26 at 2)  Defendant replies that these documents are unavailable due to the company's standard document retention policy. (D.I. 26 at 2)  Plaintiff did not file a motion to compel the information.

5

could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." Revis v. Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987)).

6

## IV. DISCUSSION

### A. Sex Discrimination Under Title VII[8]

Claims of discrimination brought pursuant to Title VII are analyzed under a burden-shifting framework, the particulars of which depend on whether the suit is characterized as a "pretext" suit or a "mixed motives" suit. Since review of the record does not reveal any direct evidence of gender discrimination and plaintiff does not purport to assert such a claim, the court will analyze the claim using the burden-shifting framework for "pretext" suits set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Krouse v. Am. Sterlizer Co., 126 F.3d 494, 500 (3d Cir. 1997).

Under this framework, plaintiff must establish a prima facie case of gender discrimination under Title VII. In order to state such a case, plaintiff must prove that: (1) she is a member of a protected class; (2) she suffered some form of adverse employment action; and (3) this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly situated person who is not of the protected class is treated differently. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).

---

[8]Plaintiffs filing claims under the DDEA "shall elect a Delaware or federal forum to prosecute the employment discrimination cause of action so as to avoid unnecessary costs, delays and duplicative litigation. A charging party is barred by this election of remedies from filing cases in both [State] Superior Court and the federal forum." 19 Del. C. § 714(c). This court has held that a plaintiff who files claims under Title VII is precluded from concomitantly pursuing state law claims under the DDEA, pursuant to 19 Del. C. § 714(c). Wilcoxon v. Red Clay Consol. Sch. Dist., 437 F. Supp. 2d 235, 246-47 (D. Del. 2006). Plaintiff, having elected to prosecute her sex discrimination claim under Title VII, is barred from simultaneously seeking remedies provided by the DDEA.

7

Once a prima facie case has been established, the burden shifts to the defendant to provide "some legitimate nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802. If defendant carries this burden, the presumption of discrimination drops from the case, and plaintiff must "cast sufficient doubt" upon defendant's proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. See Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc).

Though plaintiff is a member of a protected class and her termination constituted an adverse employment action, she has failed to establish a prima facie case because she has adduced no evidence that defendant treated employees who were not members of the protected class differently. The only "proof" plaintiff provides with regard to the third McDonnell Douglas prong comes from her own conclusory assertions that a male manager in another store was not terminated despite having a similarly poor shrink rating. She cannot provide this man's name and did not conduct any discovery on this point. While plaintiff also asserts certain co-workers told her she would be terminated because of her pregnancy, plaintiff has proffered no actual evidence to that effect. In discovery, plaintiff requested documents related to the termination of other managers within plaintiff's district; she states that said documents were not produced by defendant. Plaintiff, however, did not file a motion to compel the information and defendant indicates the documents were destroyed according to its standard document retention policy. Because no testimony or documentary evidence of record exists which might establish an inference that plaintiff was treated differently than other similarly situated individuals who were not members of her protected class,

8

the court finds that plaintiff has failed to make out a prima facie case of discrimination under Title VII.

Even if plaintiff had established a prima facie case, defendant has provided numerous legitimate reasons for her discharge. Before plaintiff provided notification of her pregnancy, she had received a failing inventory score and a failing customer service evaluation. Just one month later, she received an additional failing customer service evaluation, a poor performance review, and another poor inventory result. Plaintiff's proof of pretext is that the Wilmington store was understaffed and had inadequate security measures which led to her unacceptable shrinkage rates. However, plaintiff has not provided proof that this situation was unique to the Wilmington store. She has also failed to proffer any evidence that defendant provided better staffing and security to male managers. Consequently, plaintiff is unable to rebut defendant's legitimate explanation for its decision to fire her.

### B. Pregnancy Discrimination Act

The Pregnancy Discrimination Act ("PDA") passed as part of a 1978 amendment to Title VII. That amendment makes clear that a prohibition on discrimination "because of sex" encompasses discrimination based on pregnancy or childbirth. See 42 U.S.C. § 2000(e)(k). As a result, employers must treat pregnant women the same as others who are similarly unable to work. See In Re Carnegie Ctr. Assocs., 129 F.3d 290, 294 (3d Cir. 1997). If an employer takes an adverse employment action against a pregnant woman because of her pregnancy, then the employer has committed unlawful discrimination. See id. The Third Circuit has cautioned, however, that "[t]he PDA is a shield against discrimination, not a sword in the hands of a pregnant employee." Id. at

9

297. Plaintiff, therefore, must be able to show that defendant treated her differently than other disabled employees. See id.

The court finds that plaintiff has not established that she was terminated due to her pregnancy. While it is true that plaintiff was terminated one day after beginning her maternity leave, there exists ample evidence of record that plaintiff was not performing to her employer's expectations (namely, her poor performance review, failing customer service evaluations, and inability to meet goals related to inventory). Plaintiff had received a written warning for poor performance before she even announced her pregnancy in October 2002. Plaintiff has not put forth any evidence that other employees who were similarly unable to work were given special accommodation which she did not receive.

### C. FMLA Retaliation Claim

Plaintiff claims that defendant fired her in retaliation for her attempt to exercise her rights under the FMLA. (D.I. 1 at ¶ 30; D.I. 22 at 1) Retaliation claims under the FMLA are analyzed under the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Bearley v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004); Baltuskonis v. U.S. Airways, Inc., 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999); see also Lepore v. Lanvision Sys., Inc., 113 Fed. App'x 449, 452 (3d Cir. 2004). McDonnell Douglas sets forth a three-step analysis for retaliation claims. First, the plaintiff must establish a prima facie case of retaliation. A prima facie case of retaliation under the FMLA is established by showing: (1) plaintiff availed herself of a protected right under the FMLA; (2) plaintiff suffered an adverse employment action; and (3) there was a causal connection between the employee's protected activity and

the employer's adverse employment action. See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135 (3d Cir. 2004); Bearley, 322 F. Supp. 2d at 571; Baltuskonis, 60 F. Supp. 2d at 448. "After establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action." Bearley, 322 F. Supp. 2d at 571; see also Baltuskonis, 60 F. Supp. 2d at 448. "Finally, if a legitimate non-discriminatory reason is provided, the plaintiff must present evidence to show that the defendant's proffered reasons were not its true reasons, but were merely a pretext for its illegal action." Baltuskonis, 60 F. Supp. 2d at 448; see also Bearley, 322 F. Supp. 2d at 571. In order to survive summary judgment, a plaintiff must "either (i) discredit[ ] the [defendant's] proffered reasons . . . , or (ii) adduc[e] evidence . . . that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Torre v. Casio, 42 F.3d 825, 830 (3d Cir. 1994) (discussing McDonnell Douglas burden shifting in an Age Discrimination in Employment Act ("ADEA") case).

Plaintiff has failed to make out a prima facie case of retaliation. Specifically, plaintiff has failed to produce evidence to establish causation. It is true that there is close temporal proximity between plaintiff's taking maternity leave and her termination. See Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989). However, timing alone will not give rise to an inference of retaliation. See Quiroga v. Hasbro, Inc., 934 F.2d 497, 501 (3d Cir. 1991). The court must examine the record as a whole in determining causation. Plaintiff argues that, upon learning that she was pregnant, her supervisor abandoned her. To support her claim of abandonment, she maintains that the store

11

was not properly staffed and there was inadequate security. However, there is no evidence that defendant took, or failed to take, action because of plaintiff's pregnancy.

Even if plaintiff had established a prima facie case, defendant has raised and documented multiple, legitimate reasons for terminating plaintiff. Those reasons include two poor inventory results, two poor customer service ratings, and a negative performance evaluation. Plaintiff has failed to rebut these legitimate reasons through proof of pretext. The only statements implying pretext come from plaintiff's assertions that one other male manager also had poor inventory control results and was not similarly disciplined. Those allegations are unsupported by the record. Furthermore, even if one other manager was not terminated for poor inventory control, plaintiff also had two poor customer service evaluations and a negative performance review, supporting defendant's assertion that it fired plaintiff for poor performance.[9]

### D. Intentional Infliction of Emotional Distress

The tort of intentional infliction of emotional distress is recognized under Delaware law. See Barker v. Huang, 610 A.2d 1341 (Del. 1992) (citing Mattern v. Hudson, 532 A.2d 85 (Del. Super. 1987)). Liability exists where the conduct is outrageous and extreme in character. See Mattern, 532 A.2d at 86. The conduct must

---

[9]Plaintiff points out in her statement of facts that there are inconsistencies in defendant's responses to discovery. (D.I. 22 at 5) In its response to interrogatories, defendant indicated that no other manager in the district had been fired for poor shrink results. Subsequently, in an affidavit, the Director of Associate Relations, Deb Markowitz-Best, indicated that one other male manager within plaintiff's district had been terminated for poor shrink results. (D.I. 23 at B29; D.I. 18 at A89) Even if there is an inconsistency on this point, it does not cast sufficient doubt on the myriad of other legitimate reasons for plaintiff's termination to allow plaintiff to meet her heavy burden of establishing pretext.

be so severe that "no reasonable man could be expected to endure it." Id. Courts are to consider both intensity and duration in deciding whether the conduct has reached this level. See id.

While plaintiff has alleged intentional infliction of emotional distress in her complaint, she has not addressed the matter in her brief opposing summary judgment. Therefore, the court surmises that the distress she claims relates both to the store's staffing and security issues as well as being called in to work while on bed rest. In terms of staffing and security, such business practices may be difficult for employees but can hardly be said to constitute conduct so severe that "no reasonable [person] could be expected to endure it." When considering the intensity and duration of the incident in which plaintiff was called in to close the store on one of two days that she was scheduled for bed rest, it does not appear to the court that this conduct rises to the level of outrageousness.

## V. CONCLUSION

For the reasons stated, defendant's motion for summary judgment (D.I. 16) is granted. An appropriate order will issue.